# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

OPERA SOLUTIONS, LLC,          :
                               :
       Plaintiff,            :
                               :
v.                             :     C.A. No. 15-287-LPS
                               :
SCHWAN'S HOME SERVICE, INC.    :
                               :
       Defendant.            :

Daniel M. Silver, Jameson A.L. Tweedie, MCCARTER & ENGLISH, LLP, Wilmington, DE
Thomas J. Finn, Paula Cruz Cedillo, MCCARTER & ENGLISH, LLP, Hartford, CT

    Attorneys for Plaintiff.

Robert J. Katzenstein, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, DE
Michael D. Hutchens, M. Gregory Simpson, MEAGHER & GEER, P.L.L.P., Minneapolis, MN

    Attorneys for Defendant.

## MEMORANDUM OPINION

March 21, 2017
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court is Defendant Schwan's Home Service Inc.'s ("Schwan's" or "Defendant") motion for summary judgment. (D.I. 128) ("Motion") For the reasons set forth below, the Court will grant in part and deny in part the Motion.

**I.    BACKGROUND**

Plaintiff Opera Solutions, LLC ("Opera" or "Plaintiff") is a technology and analytics company that provides consulting services to help "deliver rapid profit improvement for its clients." (D.I. 78 ¶ 8) Defendant Schwan's is "the largest direct-to-home frozen food delivery provider in the United States, and markets and delivers its products to millions of customers throughout the country via home delivery trucks." (*Id.* ¶ 9)

On January 22, 2009, Opera and Schwan's entered into a Consulting Services Licensing Agreement ("CSLA"). (*See* D.I. 129 at 2) Pursuant to the CSLA, Opera was to provide "Production Licenses" for its sales recommendations for certain households serviced by Schwan's, in return for an annual License Fee to be paid to Opera for each Production License. (*See id.* at 2-3) The CSLA provides that Production Licenses are required for "Treated Households," which consist of the middle seven deciles of households deemed "Active Households" by Schwan's, i.e., Active Households excluding the top decile and bottom two deciles. (*See* D.I. 130-7 Ex. G § 3.2(d)) "Active Households," in turn, are defined in the CSLA as households that are active customers of Schwan's, "as determined in Schwan's sole discretion." (*Id.*) The CSLA further provides that "[t]he term of each Production License shall commence on the date such Production License is granted and shall terminate upon expiration of the Term or, if earlier, upon termination of this Agreement pursuant to Section 9." (*Id.* § 6.1)

1

The CSLA provides for limitations on the "redeployment" of Production Licenses. Specifically, Section 6.4 of the CSLA provides that:

> Except as set forth in this Section 6.4, each Production License or Quarantine License shall be granted with respect to a specific Treated Household (or other Active Household, in the case of Quarantine Licenses) and may not be transferred, re-assigned, re-deployed or otherwise applied to or used for a household other than such original, specific Treated Household (any of the foregoing being referred to as the "Redeployment" of a Production License, or to "Redeploy" such Production License).

(*Id.* § 6.4(a))

The CSLA was the subject of the parties' discussions in May 2009, during a meeting in San Diego ("San Diego Meeting"). (*See* D.I. 129 at 6) Following the meeting, the parties summarized their discussions in the "San Diego Document," which Opera sent to Schwan's on July 2, 2009. (*See id.*) According to the San Diego Document, households included in Opera's "baseline" calculations would include all spending deciles except for the bottom spending decile. (*See* D.I. 133-14 Tab 25 at 2)

On September 1, 2010, the parties modified the CSLA in writing, pursuant to the CSLA's merger clause (*see* D.I. 130-7 Ex. G § 10.10). (*See* D.I. 130-10 Ex. J) The parties' written modification was called Amendment No. 1 (the "Amendment") to the CSLA. The Amendment incorporated any CSLA provisions that were not altered by the Amendment's terms, and the Amendment expressly noted that "[c]apitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth the in the [CSLA]." (*Id.*) The Amendment also extended the CSLA's term – January 22, 2009 until December 31, 2012 ("Term") – by one year, such that the CSLA and Amendment both were set to expire on December 31, 2013. (*See*

*id.* § 2.1)

The Amendment required Schwan's to pay Opera $4,850,000 for up to 3,000,000 Production Licenses (the "Production License Threshold"), and $0.08 for each additional Production License above the Production License Threshold. (*See id.* § 6.3) The Amendment also eliminated Section 6.4's discussion of redeployment. (*See id.*) Further, it added that Schwan's selection of the "unique households" to which particular licenses would relate would be undertaken "during each calendar year." (*Id.* § 6.2)

Section 6 of the Amendment provides:

> **6.1 Production Licenses.**
> Effective as of [September 1, 2010], Opera grants Schwan a limited, exclusive, terminable (in accordance with the terms hereof) license to use and distribute the Production Phase Deliverables provided by Opera hereunder for up to Three Million (3,000,000) Treated Households in accordance with the terms hereof, including all tangible and intangible media in which such Production Phase Deliverables are expressed (each such individual household license, a "Production License"). The terms of each Production License shall commence on the date such Production License is granted and shall terminate upon the expiration of the Term or, if earlier, upon termination of this Agreement pursuant to Section 9.
>
> **6.2 Quantity of Production Licenses.**
> Throughout the Production Phase during each calendar year, Schwan shall be entitled to determine in its discretion which and how many unique households shall be served hereunder up to the Production License Threshold (as defined in Section 6.3 below). In no event shall Opera be required to refund any License Fee or portion thereof at any time or for any reason.
>
> **6.3 License Fees.**
> (a) Schwan shall pay Opera license fees ("License Fees") equal to Four Million Eight Hundred Fifty Thousand Dollars ($4,850,000) for Three Million (3,000,000) Production Licenses, which shall include the cost for converting all applicable Quarantine Licenses.

3

> In the event that the number of Production Licenses Schwan elects to license exceeds Three Million (3,000,000) (the "Production License Threshold"), for each Production License in excess of the Production License Threshold, Schwan shall pay Opera License Fees equal to Eight Cents ($0.08) per month multiplied by the number of months remaining in the Term thereof. License Fees shall be payable in accordance with Section 7.3. Notwithstanding anything in this Agreement to the contrary, Schwan shall pay the License Fees in accordance with the following payment schedule:
> . . . .
>
> **6.4    Termination of Quarantine Licenses.**
> Effective as of the Amendment Effective Date, all Quarantine Licenses shall automatically convert into Production Licenses and shall be counted against the Production License Threshold.

(*Id.*)

Finally, the Amendment required the parties to "develop and implement a mutually agreed upon and written success measures and bonus payment schedule prior to January 31, 2011." (*Id.* § 5) The bonus schedule was to be based upon macro sales number impacts or "the overall and measurable sales benefit that Schwan's experienced as a result of Opera's performance." (D.I. 129 at 8-9; *see also* D.I. 130-10 Ex. J § 5) The parties, however, did not negotiate a bonus schedule before January 31, 2011, or thereafter. (*See generally* D.I. 129 at 8-10)

Because of the parties' inability to agree to a bonus schedule, and because of Schwan's alleged breach of Section 6 of the Amendment, Opera filed suit against Schwan's on February 26, 2013 in the Southern District of New York ("SDNY"). (*See* D.I. 1) On April 1, 2015, the case was transferred to the District of Delaware, after the SDNY granted Schwan's motion to transfer over Opera's opposition. (*See* D.I. 53) In its Amended Complaint, Opera asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust

enrichment, promissory estoppel, and quantum meruit. (*See* D.I. 78) Schwan's Answer and Counterclaim includes three breach of contract counterclaims, based on allegations that Opera failed to supply Production Licenses, failed to issue monthly invoices, and breached the CSLA's venue clause. (*See* D.I. 79)

On November 2, 2015, Opera moved to dismiss "a substantial portion" of Schwan's counterclaim based on failure to supply Production Licenses and also moved to dismiss Schwan's other two breach of contract counterclaims in their entirety. (*See* D.I. 83) The Court denied Opera's motion to dismiss on July 1, 2016. (*See* D.I. 101)

Schwan's filed the pending Motion on December 22, 2016, seeking summary judgment with respect to all of Opera's claims in the Amended Complaint. (*See* D.I. 128) The parties initially completed briefing on the Motion on January 19, 2017 (*see* D.I. 129, 132, 138), and the Court heard oral argument on the Motion on February 22, 2017 ("Tr."). Thereafter, pursuant to an oral order issued by the Court (*see* D.I. 142), the parties submitted additional letter briefing discussing whether the San Diego Meeting and Document modified the CSLA's provisions. (*See* D.I. 143, 147, 148) The Court held a teleconference to discuss the issues raised in the parties' letter briefs on March 17, 2017. (*See* D.I. 151) The final pretrial conference is scheduled for April 7, 2017 and a jury trial is scheduled to begin on April 17, 2017.

## II. LEGAL STANDARDS

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co.,*

5

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating that party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50

(internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

### III. DISCUSSION

Schwan's seeks summary judgment on Opera's production license fee overage claim and bonus payments claims.[1] (*See* D.I. 129) The Court addresses each claim below.

#### A. Opera's Production License Fee Overage Claim

Schwan's seeks summary judgment that Opera's production license fee overage claim fails as a matter of law, as Schwan's "three million license threshold was not exceeded." (D.I. 129 at 18) (internal punctuation omitted) Schwan's position rests on three premises: that the San Diego Document did not modify the CSLA's provision that Schwan's would pay Production License fees for only the middle seven deciles of Active Households (*see id.* at 15; *see generally* D.I. 147); that the count of Production Licenses restarts on January 1 of each calendar year (*see* D.I. 129 at 16); and that the Amendment allowed Schwan's to redeploy Production Licenses from Inactive Households to Active Households (*see id.* at 17). The Court addresses each of

---

[1]Schwan's motion for summary judgment on Opera's production license fee overage claim corresponds to Count 1 of the Amended Complaint (*see* D.I. 78 ¶¶ 48-51), while Schwan's motion for summary judgment on Opera's bonus payments claims corresponds to Counts 2 through 5 of the Amended Complaint (*see id.* ¶¶ 53, 58, 63, 69).

Schwan's contentions in turn.

### 1. Effect of the San Diego Document and Subsequent Amendment

Schwan's first argues that neither the San Diego Meeting nor the San Diego Document modified the parties' understanding that "[Production] [L]icenses are only required for . . . the middle seven deciles of 'Active Households.'" (D.I. 129 at 15; *see also* D.I. 130-7 Ex. G § 3.2(d) (CSLA provision setting out which Active Households required Production Licenses)) While Schwan's admits that it agreed that more than seven deciles of Active Households would be treated (*see* D.I. 143 at 1 n.1; Tr. at 65), Schwan's disputes that it agreed to pay Production License fees for Treated Households outside of the originally agreed-upon middle seven deciles. (*See* D.I. 147 at 3; Tr. at 6)  Schwan's further argues that, in any event, even if the San Diego Meeting or San Diego Document orally modified the CSLA, the Amendment subsequently "restored the [CSLA's] original definitions" of Treated Households, which had the effect of resetting Schwan's obligation to pay only for Treated Households in the middle seven deciles. (D.I. 147 at 3) (internal punctuation omitted)

Opera responds by pointing to record evidence, which, in Opera's view, "confirms that Schwan's understood its obligation to pay additional License Fees as a result of the decile change." (D.I. 143 at 3)  For example, Schwan's former vice president, Bob Beckwith, admitted that "if a household was being treated, there was a licensing fee per household." (D.I. 144-1 Ex. 5 at 69; *see also* D.I. 133 Tab 26 (Schwan's internal document including nine deciles in Schwan's bonus payment methodology))  Opera also points to evidence that Schwan's requested that Opera treat more than the middle seven deciles of Active Households, even after the Amendment was executed. (*See* D.I. 133 Tab 26; *id.* Tab 27)  Thus, in Opera's view, Schwan's

8

agreed in the San Diego Document not only that more than the middle seven deciles would be Treated Households, but also agreed to pay for all Treated Households – and this did not change after the Amendment became effective.

The record demonstrates genuine disputes of material fact with respect to whether Schwan's agreed to pay License Fees for additional Treated Households in the San Diego Document or during the San Diego Meeting and, if so, whether the parties restored the original understanding of Schwan's payment obligation (i.e., that Schwan's would not pay for Treated Households outside the middle seven deciles) by executing the Amendment. A reasonable jury could find, as Schwan's asserts, that no provision of the CSLA, San Diego Document, or the Amendment – and no other document or testimony in the record – proves that Schwan's agreed to pay for Treated Households that were not within the middle seven deciles. (*See, e.g.*, D.I. 147 at 2-3) Alternatively, a reasonable jury could find that Schwan's alternative contention – that even if the San Diego Document obligated Schwan's to pay for all Treated Households, including those in the top and bottom two deciles, the Amendment eliminated Schwan's payment obligation other than for the middle seven deciles – accurately characterizes what actually occurred between the parties. More importantly, a reasonable jury could instead find that Opera is correct: that Schwan's "instruct[ed]" Opera to treat more than the middle seven deciles of Active Households and further agreed to pay License Fees for all such households. (D.I. 148 at 2) There is sufficient evidence in the record from which a reasonable jury could find for either Schwan's or Opera on these points. (*See, e.g.*, D.I. 130-7 Ex. G § 3.2(d); D.I. 131 Ex. A at 41;

9

D.I. 133 Tab 26)[2]

Accordingly, Schwan's has failed to persuade the Court that summary judgment is warranted.

### 2. Production Licenses Count

Schwan's contends that the CSLA and Amendment allowed for an "annual reset" of Schwan's Production License Threshold on each January 1. (D.I. 129 at 18) In support of its argument, Schwan's cites to the San Diego Meeting, which, in Schwan's view, "reflect[ed] the parties' pre-existing understanding that [the] attrition of inactive customers was determined at the beginning of each calendar year." (*Id.* at 17 (internal quotation marks omitted); *see also* D.I. 133-14 Tab 25 at 4)

Opera's response to Schwan's argument is twofold. First, Opera argues that Schwan's motion for summary judgment on Opera's license fee overage claim is "foreclosed" by the

---

[2]With the most recent round of letter briefing, Opera sought to supplement the record by introducing, for the first time, certain invoices Schwan's had sent to Opera during the course of their business relationship. (*See* D.I. 143 at 3) These invoices, according to Opera, show Schwan's being billed for Active Households outside of the middle seven deciles, and thus, in Opera's view, support a finding that Schwan's agreed to pay for Treated Households that were not within the middle seven deciles of Active Households. (*See id.*) Schwan's disputes the import of these invoices, at least some of which predate the Amendment. (*See* D.I. 147 at 2-3) Schwan's objects to the Court even considering these invoices as they were not produced in discovery and were only first cited by Opera after the summary judgment record had long been closed. (*See id.* at 2)

For purposes of deciding Schwan's motion for summary judgment, the Court does not consider Opera's invoices, given the timing of their production. In any event, considering the invoices would not alter the Court's conclusions on Schwan's Motion; to the contrary, the invoices further confirm the existence of genuine disputes of material fact. The Court does not decide at this time whether Opera's invoices will be admissible at trial. To the extent the parties dispute admissibility, they may present that issue as a motion *in limine* in their forthcoming pretrial order.

Court's Memorandum Opinion on Opera's motion to dismiss (D.I. 101). (D.I. 132 at 10) Specifically, Opera notes that the Court found the Amendment's provisions on the Production License count to be "ambiguous" and Opera's position to be "reasonable." (*Id.*; Tr. at 31) In Opera's view, the Court's previous determination at the motion to dismiss stage is sufficient to "preclude[] summary judgment." (D.I. 132 at 10) (internal punctuation omitted)

The Court disagrees. In deciding Opera's motion to dismiss, the Court considered only the pleadings, the CSLA, and the Amendment. (*See* D.I. 101 at 4-5) In deciding Schwan's motion for summary judgment, however, the Court may examine any evidence in the record to determine if there is a genuine dispute of material fact. Given the totality of evidence that the Court may consider during summary judgment, the Court's conclusions in the Memorandum Opinion on Opera's motion to dismiss do not automatically preclude an award of summary judgment.

Opera's second response is more persuasive. Opera observes that § 6.1 of the Amendment provides that Production Licenses "terminate upon the expiration of the Term" and contains "no mention of an annual reset on January 1st of each year." (D.I. 132 at 15 (internal quotation marks omitted); *see also* D.I. 130-10 Ex. J § 6.1) In Opera's view, it would "make [no] sense for the [Amendment] to contemplate [an annual] reset" because the CSLA provides that the License Period for each Production License is for the ***particular*** twelve-month period when "each Treated Household [is] assigned a Production License." (D.I. 132 at 13-15 ("Production Licenses were paid for in [twelve-month] '[l]icense [p]eriod[s].' . . . The License Period for each Production License began when each Treated Household was assigned a Production License."); *see also* D.I. 130-7 Ex. G §§ 6.1, 6.3) Opera notes that § 6.3 of the

11

Amendment specifies that "Schwan's shall owe $0.08 *per month* for the remaining ***Term of the [A]greement*** for any Production Licenses in excess of the Production License Threshold." (D.I. 132 at 15-16 (emphasis in original); *see also* Tr. at 40; D.I. 130-10 Ex. J § 6.3) As Opera sees it, "[i]f the Production License count reset every January 1st, then the excess license fees due to Opera would be determined by reference to the number of months remaining in the calendar year, *not* the number of months remaining in the Term." (D.I. 132 at 16) (emphasis in original)

A reasonable finder of fact could – but, on the current record, need not – agree with Opera. That is, there is a genuine dispute of material fact as to whether the parties agreed to restart the Production Licenses count each January 1. Schwan's may be able to prove that the San Diego Document memorialized the parties' understanding that attrition rates would be calculated at the beginning of each calendar year. (*See* D.I. 133-14 Tab 25 at 4) But Opera's conflicting interpretation of the evidence – essentially, that the parties agreed to a cumulative, rather than an annual, count of Production Licenses – may alternatively persuade a reasonable jury. (*See* D.I. 132 at 15-16)

Accordingly, Schwan's has failed to persuade the Court that summary judgment is warranted.

### 3. Redeployment of Production Licenses

Schwan's Motion is further premised on its contention that the Amendment removed the CSLA's restrictions on redeployment of Production Licenses from Inactive Households to Active Households. (*See* D.I. 129 at 17) Schwan's contends that § 6.2 of the Amendment is in substance a redeployment clause, as it allows Schwan's to determine "which unique households would be served during each calendar year." (D.I. 138 at 5-6) (internal quotation marks omitted)

12

Schwan's explains that its position is consistent with "the intent underlying" the Amendment," which was "to reduce Schwan's expenses related to the contract" and "reduce customer attrition." (D.I. 129 at 17) (emphasis omitted) Restrictions on redeployment would, instead, have increased Schwan's costs and incentivized Opera to maximize customer attrition, provisions to which Schwan's would not have agreed, particularly given the strong voices within Schwan's that preferred to end the business relationship with Opera altogether. (*See id.* at 6-7)

As additional evidence that the Amendment permits redeployment, Schwan's points out that Opera's contrary interpretation would mean that Schwan's would have exceeded the Production License Threshold within approximately five to seven months after execution of the Amendment. Schwan's bases this argument on its view of the record that at the time the Amendment was executed, Opera treated approximately 2.7 million customers and had a "churn rate" (i.e., the rate at which current customers stopped buying from Schwan's and were replaced by new customers) of approximately 20% annually, which is equal to around 45,000 customers per month. Doing the appropriate math, Schwan's would have had available to it only about 300,000 Production Licenses, and would use about 45,000 of those each month, meaning it would exceed the Production License Threshold just about a half of a year after executing the Amendment.[3] Schwan's asks the common sense point: why would it agree to do such a thing? Schwan's answer, of course, is that it would do nothing of the kind, and that what occurred

---

[3]The evidence supporting Schwan's calculation is found and/or discussed in, among other places, Tr. at 17 (churn rate); D.I. 133-3 Tab 12 at 150 (number of customers). Schwan's calculation, and Opera's competing calculations – based on a base of just 2.2 or 2.5 million customers at the execution of the Amendment, implying that it was knowable at that date that the Production License Threshold would not be exceeded for approximately two years – were also discussed at length during the March 17, 2017 teleconference. (*See also* Tr. at 46; D.I. 143 at 1 n.2; D.I. 130-31 Ex. EE at 6)

13

instead is that the parties agreed and understood that the Amendment permitted redeployment, so any "churn" would only move Schwan's closer to the Production License Threshold to the extent that new Treated Households gained exceeded the loss of old Treated Households.

While Schwan's tells a persuasive story, it is not the Court's task at summary judgment to weigh the evidence. For there is, contrary to Schwan's view, competing evidence, from which a reasonable jury might find that Opera's contrasting view of what occurred is actually correct. In Opera's view, the absence of any redeployment provisions in the Amendment "demonstrate[s] [the] parties' intent" to remove those provisions from the Amendment.[4] (D.I. 132 at 15) For example, Opera points out that "[n]ot a single Schwan's witness" could provide an example of redeployment under the Amendment or "explain how Schwan's would have gone about requesting redeployment." (*Id.* at 16) (emphasis omitted) In particular, Opera cites testimony of Schwan's former vice president, Bob Beckwith, who stated that "the absence of a redeployment provision meant that there was no right of redeployment."[5] (Tr. at 43, 59-60)

Genuine disputes of material fact preclude granting Schwan's summary judgment with respect to whether the Amendment allowed redeployment.

---

[4]Opera again insists that the Court's Memorandum Opinion on Opera's motion to dismiss (D.I. 101), stating the CSLA's provisions on redeployment were "ambiguous" and describing Opera's position as "reasonable" (*id.* at 9), "preclude[] summary judgment" (D.I. 132 at 10) (internal punctuation omitted) For the reasons already explained, the Court disagrees with Opera.

[5]The parties have a disagreement as to whether Beckwith had adequate knowledge to testify reliably about the Amendment. Opera contends that Beckwith was "heavily involved" in negotiating the Amendment (Tr. at 43; *see also id.* at 68), but Schwan's insists that Beckwith was "booted out of the negotiations on the Amendment" (*id.* at 60). A factfinder will have to determine how much, if any, weight to give to Beckwith's testimony (assuming he is called to testify at trial).

14

* * *

As the record reveals genuine disputes of material fact with respect to each of the three premises on which Schwan's motion for summary judgment on Opera's Production Licenses claim is based, the Court will deny Schwan's Motion as to this claim.

**B.      Opera's Bonus Payments Claims**

Schwan's seeks summary judgment that Opera's bonus payments claims fail as a matter of law. In Schwan's view, Schwan's acted in good faith by attempting to negotiate the Amendment's bonus schedule prior to January 31, 2011, the deadline set by the Amendment. (*See* D.I. 129 at 19-20) Schwan's further contends that its lack of bad faith is sufficient to dismiss Opera's equity-based claims: unjust enrichment, promissory estoppel, and quantum meruit. (*See* D.I. 138 at 9) Finally, Schwan's contends that "Opera is unable to establish any damages flowing from the [parties'] failure . . . to reach [an] agreement on a new bonus term." (D.I. 129 at 20)

The Court addresses each of these arguments below.

**1.      Good Faith Negotiations**

Schwan's argues that it "attempt[ed] to negotiate a bonus term [in good faith]" prior to January 31, 2011 (D.I. 129 at 20), citing evidence that it took steps to negotiate the bonus term "from September 1, 2010 (the effective date of the Amendment) to January 31, 2011" (D.I. 138 at 8 (emphasis omitted); *see also* D.I. 129 at 19-20) Opera responds that Schwan's made "[the] resolution of the 2011-2013 bonus provision by January 31st impossible" by moving the meeting to discuss the bonus term from January 28, 2011 to February 3, 2011. (D.I. 132 at 18)

The implied covenant of good faith and fair dealing "requires a party in a contractual

15

relationship to refrain from arbitrary or unreasonable conduct [that] has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotation marks omitted). "A finding of bad faith is necessarily a fact-intensive inquiry." *RGC Int'l Inv'rs, LDC v. Greka Energy Corp.*, 2001 WL 984689, at *11 (Del. Ch. Aug. 22, 2001) (internal quotation marks omitted). "[The] term 'bad faith' is not simply bad judg[]ment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 n.11 (Del. 1994) (internal quotation marks omitted; first alteration in original).

Under this standard, and viewing the evidence in the light most favorable to Opera, the evidence fails to raise a genuine dispute of material fact. Opera does not dispute the evidence Schwan's points to that Schwan's attempted to negotiate a bonus term "from September 1, 2010 (the effective date of the Amendment) to January 31, 2011." (D.I. 138 at 8 (emphasis omitted); *see also generally* D.I. 132 at 18) Nor does Opera contend that Schwan's acted in procedural bad faith by failing to engage with Opera in negotiating the bonus term. (*See* D.I. 138 at 8) Finally, although Opera emphasizes that Schwan's rescheduled the parties' January 28 meeting to February 3, thus "making resolution of the 2011-2013 bonus provision by January 31st impossible," Opera does not argue – nor cite record evidence from which a reasonable jury could find – that Schwan's actions were motivated by "dishonest purpose" or "ill will" or were "unreasonable" or "arbitrary." (D.I. 132 at 18; *see also Dunlap*, 878 A.2d at 442; *Desert*

*Equities*, 624 A.2d at 1208 n.11)

Accordingly, the Court will grant summary judgment to Schwan's on Opera's implied covenant of good faith and fair dealing claim.

### 2. Equity-Based Claims

Schwan's next argues that "Opera's claims for . . . unjust enrichment . . . , promissory estoppel . . . , and quantum meruit . . . should be dismissed because Opera has not come forward with facts showing procedural bad faith." (D.I. 138 at 9) Opera counters that procedural bad faith is not required "per se as an element" of any of its equity-based claims. (Tr. at 54; *see also* D.I. 132 at 19) The Court agrees with Opera. Thus, the lack of evidence from which a reasonable jury could find that Schwan's acted with procedural bad faith does not defeat Opera's equity-based claims. Therefore, Schwan's is not entitled to summary judgment on these claims.

### 3. Damages

Finally, Schwan's contends that "Opera's equity-based claims for a bonus fail as a matter of law" because "Opera is unable to establish any damages flowing from the [parties'] failure . . . to reach [an] agreement on a new bonus term." (D.I. 129 at 20) Schwan's points to evidence that its sales did not increase from 2011 to 2013, "which means that Opera would not have received a bonus under *any* bonus term based on macro sales number impacts," even if the parties had agreed to a bonus provision. (*Id.*) (emphasis in original)

Opera responds that it need not prove damages to succeed on its equity-based claims. (*See* D.I. 132 at 18-19) Opera further contends that "genuine issues of material fact preclude . . . an assumption" that Opera would not have received a bonus, for reasons including that macro sales number impacts could include metrics other than an increase in Schwan's net sales. (*Id.* at

20)

The Court agrees with Opera. Damages are not part of Opera's prima facie case on any of its remaining equity-based claims: unjust enrichment, promissory estoppel, and quantum meruit. (*See* D.I. 132 at 19) (citing cases) To the extent damages are part of the relief Opera is seeking (*see* D.I. 78 at 14-15), Opera points to record evidence from which a reasonable jury may conclude that some metric other than Schwan's net sales would have been the metric the parties may have agreed to as the basis for determining a bonus under the Amendment (*see* D.I. 132 at 20; D.I. 138 at 9)

Accordingly, the Court will deny Schwan's motion for summary judgment that Opera's remaining equity-based claims fail as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Schwan's Motion. An appropriate Order follows.